UNITED STATES DISTRICT COURT           SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Gerald O. Bailey, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| *versus* | § | Civil Action H-05-1029 |
| | § | |
| Shell Western E&P, Inc., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## Opinion on Summary Judgment

1.    *Introduction.*

   Three plaintiffs accuse oil companies of purposefully miscalculating royalty payments to their detriment.  Though they sue under a wide variety of poorly defined legal theories, the case is essentially a contract dispute.  The plaintiffs signed the contract, and it is clear about the parties' rights and duties.  The method used by the oil companies to calculate royalty payments is proper.  After some twenty years of baseless complaints and fifteen years of expensive, unnecessary litigation, this is the end.

2.    *McElmo Dome.*

   The McElmo Dome is a carbon-dioxide reservoir covering 203,000 acres of Monte-zuma County, in southwestern Colorado.  The gas is used in oil fields – it is injected into them to help drive the oil toward producing wells.  Until the early 1980s, the gas was produced from seven tracts.

   In 1982, Shell Western E&P and Mobil Producing Texas & New Mexico, Inc., decided to combine the tracts for increased efficiency.  When they applied to form a unit, the Colorado Oil and Gas Commission required the producers – Shell for convenience – to get consent from 80%  of both working and royalty interests.  Shell owned 87% of the working interest, satisfying that requirement.  The United States Minerals Management Service consented for its 76% of the royalty interest.  Shell needed the approval of only 4% more of royalty interest.

Shell sent the owners of the royalty interests: (a) a brochure about the project; (b) the unit agreement; and (c) a consent form. The owners of an additional 16.5% of royalty interests consented, giving Shell a total of 92.5%. The commission approved the unit.

Also in 1982, Cortez Corporation, Mobil Cortez Pipeline, Inc., and Continental Cortez Pipeline Company created Cortez Pipeline Company. They formed it to finance, construct, and operate a pipeline to transport the gas from southwestern Colorado through New Mexico into West Texas – approximately 500 miles.

3.    *The Conflict.*

Shell began paying royalties in 1984. Twelve years later, some royalty owners sued Shell in Texas and Colorado, disputing its calculations for the first time. They primarily argued that Shell was not allowed under the leases, assignments, and unit agreement to charge them for the cost of moving the gas to Texas.

The royalty owners say that they are entitled to royalties based on the price of the gas delivered in Texas. They say that somehow Shell promised that they would not pay transportation costs, so it may not charge them. They have two theories: First, Shell breached its contractual obligations. Second, if the contracts allow the "deductions," then it tricked them into signing the contracts.

4.    *The Calculation.*

Although they can pick any method the parties prefer, leases ordinarily specify one of these methods to calculate royalties:

- The value – price – of gas at the wellhead;
- The value of gas after gathering, dehydration, compression or other process to standardize it; or
- The value of gas at a point downstream, usually a sale.

The value of a commodity varies depending how much work it takes to get it ready for sale and transported to a market. Iron ore's value at the portal of a mine in the Mesabi Range in Minnesota is lower than its value delivered at a steel mill in Gary, Indiana. The difference represents the cost of the intermediate steps to get it to the mill – like freight, credit risks on the downstream sales, and compensation for the entrepreneurial effort. The only use for the ore at the mine is selling it to someone who will process and transport it to market. The

problem of intermediate steps applies to all commodities, from Toyotas in Japan through wheat in Kansas to carbon dioxide in Colorado.

Carbon dioxide's principal use in large volumes is injection into secondary-recovery wells in ageing or otherwise low-pressure oil fields. West Texas needs a lot of the gas, while Colorado needs little. That makes Texas a market. The value of the gas at the wellhead needs to be calculated.

The value of a commodity at a source may be indeterminate unless (a) it has alternative potential buyers at the source, (b) its site and condition are sufficiently parallel to the commodity elsewhere to compel a close analogy, or (c) its value at the source can be reasonably estimated by working from the remote sales price back to the source.

This Colorado gas is in the last class. Shell calculated the value of the gas at the wellhead in Colorado by subtracting the cost of standardization and transportation from the price it received from the injecting oil operators in West Texas.

5.    *The Lawsuits.*

In 1996, the $CO_2$ Coalition – seventy owners of varying interests in McElmo Dome – brought a putative class action against Shell, Kinder Morgan, Mobil, and Cortez Pipeline in Colorado federal district court. In 2000, three other class actions were filed in that court by classes of (a) land owners, (b) royalty owners, and (c) non-operating working interest owners. In September 2001, the four cases were settled. Ninety-six percent of the royalty-interest owners joined in the settlement.

In January 2002, Harry Ptasynski, Bridwell Oil, Gerald Bailey, and W.L. Gray & Company chose not to join the settlement. The parties were further narrowed by Bridwell Oil's settlement in June 2006. The remaining plaintiffs are (a) Gerald Bailey, (b) Harry Ptasynski, and (c) W.L. Gray & Co.

In 1997, Bailey sued Shell in the Northern District of Texas. He made several claims under state law and one under federal law. He lost on every claim.

In 1997, Ptasynski and Gray sued Shell, Mobil, and Cortez Pipeline in the Northern District of Texas. They made several claims under state law and one under federal law. They lost on every claim.

In 1998, Shell sued in state court in Houston, Harris County, Texas, asking the court to declare its royalty obligations. Bailey counterclaimed. By March 2001, all but Bailey's fraud-based counterclaims were resolved in favor of Shell. At that time, the probate court for Denton

County, Texas, took the case from the Harris County district court at the request of the plaintiffs in another case. In late 2002, the Texas Supreme Court vacated the transfer, and it returned the case to Harris County. It was then abated until March 2004. In March 2005, Bailey removed it.

In 2004, Ptasynski & Gray – for themselves, the United States, Colorado, and Montezuma County – sued Kinder Morgan G.P., Inc., in Colorado federal court. The government declined to participate directly. Because the plaintiffs asserted claims identical to those Bailey made in his counter-claim, the Colorado suit was transferred here.

6.      *This Case.*

Gerald O. Bailey is a geologist. From 1973 to 1976, Bailey acquired interests in Dolores and Montezuma counties by leasing minerals and buying working interests. In 1982, Bailey held interests under sixty-two leases on acreage that became part of the McElmo Dome Unit. Since 1997, he has been pursuing unfounded litigation against Shell with the help of his attorney, Robert Perry.

Bailey's complaint does not specify his claims. Rather, a rambling seven pages titled "claims for relief" appears to include (a) breach of contract, (b) breach of fiduciary duty, (c) violation of anti-trust laws, (d) fraud, (e) civil theft, and (f) conspiracy.

Harry Ptasynski is a citizen of Casper, Wyoming. He has owned overriding royalty interests in the McElmo Dome since it was formed. W.L. Gray & Co. is a Colorado partnership that succeeded to the overriding royalty interests of W.L. Gray in the unit.

Ptasynski and Gray sue for (a) damages under the False Claims Act, (b) breach of contract, (c) breach of fiduciary duty and confidential relationship, (d) breach of implied duties to market and good faith and fair dealing, (e) violation of federal and Colorado anti-trust laws, (f) violation of the Colorado Unfair Practices Act, (g) civil theft, and (h) a declaratory judgment.

7.      *Already Done.*

A claim is barred when (a) the same parties are in both actions, (b) the court had jurisdiction of the first action, (c) the court decided the merits, and (d) the same transaction is involved in both suits. If these conditions are satisfied, the claims or defenses arising from

a common nucleus of facts are extinguished.[1]  A party with more than one remedy for a wrong must assert them all in its first action.[2]

In 1998, Ptasynski and Gray sued Shell in Dallas on underpayment of royalties.  The parties and transaction are identical to those here.  The court had jurisdiction.  The action concluded with a final judgment on the merits – Ptasynski and Gray lost.  While Ptasynski and Gray have included different legal theories in this case, the cause of action – the facts giving rise to the claim – is the same.  They are claiming Shell underpaid their royalties under the instruments of their interests including those of the unit.  For these reasons, Ptasynski's and Gray's claims are exhausted.

Even if they had not been litigated earlier, they would take nothing on their claims for the same reasons Bailey will not.

8.      *Repeat Offenders.*

Bailey argues that each time he receives a payment less than what he says he deserves, Shell has injured him anew.  Bailey uses this logic to sue – over and over again.  There is one set of facts that creates a basis for the suit – Shell's calculation of royalties in the McElmo Dome.  Shell has calculated them correctly.  Bailey has never been injured – much less repeatedly.  This is the last time Bailey can sue on these facts.

9.      *Breach of Contract.*

In 1973 and 1974, Bailey acquired several mineral leases in Montezuma County, Colorado.  Bailey assigned the leases to a third party, retaining an overriding-royalty interest.  That party assigned the leases to Shell.  In 1983, Shell sent Bailey and other royalty owners a unit agreement.  It said that the royalties were to be paid in conformity with the contracts, laws, and regulations. Bailey signed the unit agreement.  In 1984, Bailey agreed to a series of division orders.

---

[1] *Proctor & Gamble Co. V. Amway Corp.,* 376 F.3d 496, 499 (5th Cir. 2004).

[2] *Baltimore S. S. Co. v. Phillips*, 274 U.S. 316, 319 (1927).

Bailey says that Shell breached the unit agreement by "wrongfully and illegally deducting transportation charges and expenses from the royalty payments."[3] He says that the others and he were promised the downstream value.

Bailey's overriding royalty was created by assignment. It says that he gets a percentage of the value at the wellhead – not of the downstream value. This value is determined by subtracting the post-production costs – including transportation– from the value realized beyond the wellhead. Further, the assignment incorporates the underlying leases. Shell paid Bailey exactly what he contracted for – the downstream value less the cost of getting it there.

The unit agreement does not change this; it says that royalty obligations are determined under the assignments and leases.

Because of the complexity of mineral titles and because both sides need to tend to their own business, producers do not disburse royalties until the potential recipients agree in writing what share they are going to be paid. These are called division orders. Bailey signed 32 of them.[4] They describe the royalty formula and say:

> Settlement for each interest shall be made on the volume of total unit production sold or delivered, and allocated to [your] Tract, and on the price received by the lessee, less applicable charges including transportation.[5]

This is the wellhead value of a commodity without a broad market. The Shell contract specified the value at the wellhead, and the division orders disclosed how Shell derived it.

Bailey signed these orders and accepted payments under them beginning in 1984. Bailey first expressed discontent six years later, in a letter in 1990. He said nothing more for seven years – until after the 1997 suit. Bailey has waived his claim to larger payments.[6]

---

[3] (Bailey Am. Complaint at 105).

[4] (Shell's Motion for Summary Judgment, Ex. 6 j–k).

[5] *Id.*

[6] *Mattalino v. Trinity Petroleum Exploration,* 927 F.Supp. 986, 989 (S.D.Tex. 1996) (Geologist waived larger overriding royalty interest payments because he signed a division order, accepted payments, and knew the oil business).

The plaintiffs insists that Colorado law prohibits charges from the value of the royalty-interest oil before its being in a commercial marketplace and in marketable condition.[7]  In one confusing and probably wrong case, the court determined that the leases before it required that the operator not deduct the costs of post-production treatment – because the leases did not expressly allocate them.  The case also addressed the reasonableness of the producer's effort to market the gas; transportation to a market was discussed but not decided.

Bailey has a right to a percentage of the value of the production – cost free – at the wellhead.  He says that Shell is deducting freight from his share before paying him.  This case will be decided under Texas law;[8] Colorado law is probably the same.[9]  The controversy here is over  transportation costs, not production costs or marketable condition.

The leases in this case are not silent.  They were incorporated into the unit agreement and say that transportation costs may be deducted.  The division orders, the last documents signed by the plaintiffs, also say that transportation costs may be deducted.  Finally, the plaintiffs in the Colorado case did not continue to accept royalty payments for six years without complaint, waiving their claim to higher payments.

At least some of the leases that can be read also say that the royalty is payable from the price at the well.  "At the well" is a pricing term – an unambiguous one.  If a lease says that the royalty is one-eighth of the market price of the gas at the wellhead of a particular well in Montezuma county, Colorado, it is exactly as commercially precise and reliable as the sales contract for 1,000 head of cattle that says it is at the market price free on board – F.O.B. – truck Moffat County, Colorado.  Neither of those agreements would contemplate that the price will be determined by the goods in a different condition after some treatment or another location after transportation.  *See Harsh v. Cure Feeders*, 116 P.3d 1286, 1289 (Colo. App. 2005); *see TransAmerica Corp. v. Marrion*, 255 P.2d 391, 398 (Colo. 1953).  "At the well" is directly parallel to "free along side" the wellhead.

---

[7] *See Rogers v. Westerman Farm Company* 29 P.3d 887 (Colo. 2001); *But see* Scott Lansdown, *The Marketable Condition Rule*, 44 S. Tex. L. Rev. 667 (Summer 2003).

[8] *Heritage Res. v. NationsBank* , 939 S.W.2d 118, 122 (Tex. 1996);     *Judice v. Mewhourne Oil Co.,* 939 S.W.2d 133, 135 (Tex. 1996).

[9] *Atlantic Richfield Co. v. Farm Credit Bank of Witchita,* 226 F.3d 1138, 250 (10th Cir. 2000)(Colorado law).

The claimants have consented to the treatment of which they complain. The producers have adhered to the instruments between themselves and the claimants. The producers have not breached a contract.

10.     *An Action in the Public Interest.*

Bailey sues under the False Claims Act on behalf of the United States of America, the state of Colorado, and Montezuma County.[10] The purpose of the False Claims Act is to recover losses to the United States government through fraud. [11]  A plaintiff may not sue based on publicly disclosed information about fraud unless he was the original source of those facts. [12] Bailey has pleaded and argued no fact that would convince a rational jury that (a) his facts and theories were not public or (b) he was the original source.[13]

Bailey does not contest that his claim is primarily based on public information; this is likely because he had already sued on this same claim.  Indeed, many other royalty owners have sued Shell for this reason.[14]  The information became a public record when the complaints were filed.[15]

Bailey insists that because his suit contains some non-public information, Shell's position that all material claims are public is "destroyed."  Secret trivia does not change the elemental nature of Bailey's suit: Shell underpaid royalties.[16]

---

[10] 31 U.S.C. § 3730.

[11] Charles Alan Wright, et al., Federal Practice and Procedure § 3653 (3rd ed. 1998).

[12] 31 U.S.C. § 3730(e)(4).

[13] *United States v. Alcan Elec. & Engineering,Inc.* , 197 F.3d 1014, 1018 (9th Cir. 1999); *United States ex rel. Stone v. Rockwell Int'l. Corp.* , 282 F.3d 787, 800 (10th Cir. 2002).

[14] (Bailey Am. Complaint at 12–15)

[15] *See Kennard v. Comstock*, 363 F.3d 1039, 1042–1044 (10th Cir. 2004);  *United States ex rel. Regan v. East Texas Medical Center Regional Healthcare System*, 384 F.3d 168, 174 (5th Cir. 2004).

[16] *See United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1051 (10th Cir. 2004) (Relator's additional nonpublic information fails the jurisdictional requirements because material elements of the transaction were already public).

Because the allegation had been made public, Bailey must show that he is its original source.[17]  He can not.  Bailey says that he had "direct and independent knowledge" of the fraud because of (a) his investigation beginning in 1990 and (b) his 1997 suit against Shell.

Bailey's 1990 "investigation" is a letter he wrote Shell about gas pricing.[18]  Bailey also says that his investigation continued from 1994 to 1996.  To support this claim, he offers two 1996 e-mails between Shell employees.  He claims that the Shell employees are discussing "a letter from Mr. Bailey asking for information."[19]  First, the e-mails actually respond to the inquiries of another royalty owner, Bob Pelo.[20]  They describe the general "sensitive" relations with royalty owners over this issue.  These e-mails contradict Bailey's being the origin by indicating that others are – at the least – contemporary, parallel sources.  Bailey also refers to letters written to him from Shell responding to a pricing question.[21]  These letters do not show that Bailey discovered fraud.

The record lacks other documents that suggest an investigation.  The single letter is not an investigation, and it does not suggest that Bailey uncovered fraud.[22]  Even if Bailey's letter evinced an investigation, Bailey must show that his investigation discovered something other than what the public already knew.[23]  He can not, clearly, in light of the numerous other royalty payment cases about the McElmo Dome.

Bailey also offers his first suit against Shell in 1997 as evidence that he is the origin.  In 1996, the year before Bailey's suit, seventy McElmo interest owners sued Shell.[24]  Bailey cannot

---

[17] U.S.C. § 3730(e)(4)(B).

[18] (Bailey Am. Complaint, Ex. 17).

[19] (Bailey Am. Complaint at 78).

[20] (Bailey Am. Complaint Ex. 31-32).

[21] (Bailey Am. Complaint Ex. 33–34, 37).

[22] *Grynberg*, 389 F.3d at 1054 (Plaintiff bringing suit on underpayment of royalties was not original source because he did not directly detect the fraud.)

[23] *See Reagan*, 384 F.3d at 179.

[24] (Bailey Am. Complaint at 1, 73–75)

be the original source of information "acquired from the labors of others"[25] or from reading the papers.  This suit exemplifies why these jurisdictional bars are necessary to prevent parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud.[26]

Even if Bailey could overcome these bars to his suit, he has revealed no fraud.  Bailey's claim is that Shell owes the United States money for royalties.  For his case, he relies on a brochure, despite his having signed a contract with Shell governing these payments.  He knows nothing of what the government received, knew, asked, or relied on.  Like Bailey's personal claims, the government might have a contract dispute on its hands – not a fraud.

Bailey's claims for the State of Colorado and Montezuma County fail.  The False Claims Act does not allow for suits on behalf of a state or its county.[27]  In 2000, a bill was introduced in the Colorado General Assembly called the "Colorado False Claims Act," but it was not passed.[28]  Because no federal or Colorado law gives Bailey authority to sue for them, Bailey's claims on their behalf will be denied.

Bailey says that this court cannot dismiss his claims for the government without approval from the United States.  First, the United States has confided this dispute to Bailey; it did that when it declined to accept responsibility itself.  Second, despite many unrepublican exceptions in favor of the government, the courts have decided cases affecting the executive since Jefferson's first term without the permission of that branch.[29]

---

[25] *See United States ex rel. Fine v. Advanced Sciences*, 99 F.3d 1000, 1006–1007 (10th Cir. 1996).

[26] *United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs., Co.*, 336 F.3d 346, 351 (5th Cir. 2003).

[27] *See* 31 U.S.C. § 3730(b).

[28] H.B. 1094, 62nd Gen. Assem., 2nd Reg. Sess. (Colo. 2000).

[29] *Marbury v. Madison,* 1 Cranch* 137 (1803);  *Searcy v. Phillips Electronics North American Corp.*, 117 F.3d 154, 158 (5th Cir. 1997) (Whether *voluntary* dismissals needed the Attorney General's approval).

11.   *Fiduciary Duty.*

Texas law generally does not recognize a fiduciary duty in business transactions.[30]   In an ordinary commercial, contractual relationship, no duty exists.[31]   To establish a fiduciary duty in a business transaction, the relationship must have existed before the agreement forming the basis of the suit.[32]

Shell had no earlier relationship with Bailey, nor have they ever had a relationship of trust and confidence – formal or informal.   Rather, Shell was an assignee and Bailey an owner of an intermediate non-working interest.   Texas law has never recognized a fiduciary relationship between a royalty owner and an operator.[33]

An agency is a relationship that normally includes fiduciary duties.   An agent owes a duty of fidelity to his principal.   Shell was not Bailey's agent.   The unit agreement describes Shell as an independent contractor – not an agent; it is accurate because Bailey had no authority to control Shell's operations.   Bailey was simply entitled to royalty payments.   Shell owes no obligation of care to serve Bailey faithfully.

12.   *Antitrust.*

Antitrust laws are designed to increase competition – to stop companies from colluding to raise consumers' costs through set prices or allocated markets.   Bailey's royalty payment – under any method of calculation – is a percentage of the price of gas.   If Shell conspired to raise the price of McElmo gas, Bailey would benefit.   Bailey has no antitrust injury.   Shell's charging in parallel with other unit operators is a conspiracy, but it is a legitimate one, approved by the State of Colorado.   Joint management of properties would have been legal without the government sanction.   Bailey has identified no market in which Shell's cooperation would have been anti-competitive or potentially dominate.   Also, with only one practical market, the producers are not colluding as much as jointly accepting the state of their world.

---

[30] *See English v. Fisher,* 660 S.W.2d 521, 522 (Tex. 1983).

[31] *Central Sa. & Loan Ass'n v. Simmons Northwest Bank, NA,* 848 S.W.2d 232, 239 (Tex. App. – Dallas 1992, no writ).

[32] *See Schlumberger Tech. Corp. V. Swanson,* 959 S.W.2d 171, 176 (Tex. 1997).

[33] *HECI Exploration Co. V. Neel,* 982 S.W.2d 881 (Tex. 1998).

Further, Bailey is not a competitor of Shell.  Bailey does not buy gas, sell gas, or otherwise participate in the carbon-dioxide market in competition with Shell. He lacks standing to bring an antitrust claim.

13.     *Fraud, Civil Theft, and Conspiracy.*

Bailey's fraud, civil theft and conspiracy claims are merely slices of his disagreement about his royalty calculation.  His unhappiness about a deal he made in 1982 does not make cheaters of the other contracting parties.

This is the "fraud" that he identifies:  In the negotiations leading to the unitization of the dome,  Shell gave him a brochure with a knowingly false statement.  Shell intended him to rely on it .  He says he did reasonably rely on it to his detriment.  A brochure – misleading or otherwise – is superceded by the operating unit agreement.  Bailey is like someone who signs a 30-year office lease of a dozen pages and who, when he becomes unhappy, sues for fraud because a brochure he was given said it was a great location. The unit agreement explains the parties' relationship in detail, and it sets Shell's obligations.

Further, for fraud to exist, the representations Shell made to Bailey must have been clearly untrue, known to have been untrue at the time, and relied on reasonably by Bailey to his detriment.  Bailey cannot get past the first requirement because Shell's statements are true. The misrepresentations are that Bailey would be entitled to royalties on the downstream value. Nowhere in the representations – the unit agreement or the brochure – does it even mention downstream value.

Bailey's confusion – if he is confused, rather than obstinate – may stem from the statement that royalty owners will not have to pay transportation costs.  This is true.  Royalty owners were never asked to pay for pipeline construction, maintenance, or anything else.  Their royalty payments were calculated as specified in the contract by a percentage of value at the wellhead. The value of gas at the wellhead is calculated – of necessity and economics – by deducting transportation costs.  This is the distinction that continues to elude Bailey.  His misunderstanding is not Shell's fraud.

The civil theft claim is that Shell paid Bailey less than what was owed.  Bailey should have been told by his lawyer that an underpayment results in a debt not a theft.

The conspiracy is an expansion of an underlying wrong. Bailey simply claims that Shell was assisted by people who helped it receive "secret payments." A claim for conspiracy fails because it is not supported by an independent tort.[34]

14.    *Conclusion.*

America is blessed with a legal system that allows an aggrieved person to initiate a suit to petition for redress. This openness has its costs. Many people who are unlearned and without the assistance of counsel bring actions that consume scarce private and public resources. The waste can be tolerated – tolerated to a point. When Gerold O. Bailey, Ptasynski, and W.L.Gray & Co. decide with the connivance of their lawyer, Robert Perry, to repeat a lawsuit, to expand it, and to persevere when sane men would quit, their public and private victims are not obliged to supinely accept the waste imposed on them. These people of broad experience and sophisticated education are not wards of the court.

In what the court would consider an equitable cost-shifting sanction, it invites the defendants to request relief from some of the burden of this legally misguided, factually unfounded, repetitive litigation.

In every capacity, Bailey, Ptasynski, and Gray will take nothing on their claims against the defendants.

Signed on April 22, 2008, at Houston, Texas.

Lynn N. Hughes
United States District Judge

---

[34] *See Carrol v. Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 955 (Tex. 1979).